ARKANSAS MIDLAND RAILROAD COMPANY v. PEARSON.

Opinion delivered March 20, 1911.

1. MASTER AND SERVANT—LIABILITY FOR NEGLIGENCE OF MEDICAL MEN.— Where a railway company gratuitously assumed to collect and preserve a fund deducted from the salaries and wages of its employees and therefrom to provide hospital accommodations and medical attention to its injured employees without any profit or gain therefrom, it will not be responsible for negligence of the physicians and surgeons employed at such hospital, unless it agreed to become liable for their negligence, providing it used ordinary care in their selection. (Page 409.)

2. EVIDENCE—EXPERT EVIDENCE—FORM OF HYPOTHETICAL QUESTION.—In propounding a hypothetical question to an expert witness the data upon which it is based need not cover all of the facts which have been proved in the case. (Page 412.)

Appeal from Phillips Circuit Court; *Hance N. Hutton,* Judge; reversed.

STATEMENT BY THE COURT.

This suit was brought by appellee to recover damages for the benefit of the widow and next of kin and the estate, for the wrongful death of his intestate, caused, it was alleged, by the failure to furnish him proper medical and surgical attention.

It was alleged that the deceased, Jack Campbell, while in the discharge of his duties as conductor of a freight train on appellant's road, known as the accommodation, running from Helena to Clarendon and return, jumped or fell from the top of one of the box cars on September 22, 1908, at about 11:45 A. M., and sustained from said fall the following injuries: "a comminuted fracture of the right ankle and fracture and dislocation of the left ankle." That both said injuries were serious, and the demand for immediate skillful attention urgent. That the train was ordered to proceed on its regular trip, and the said Campbell was left at the town of Holly Grove, where only the most perfunctory attention was given him until the return trip of the train about

2 o'clock P. M.   That he was then placed on a crude cot in one of these box cars, and, without any attendant provided by defendant, was brought to the city of Helena, arriving at 8:30 P. M. That while said Campbell was in said box car, the train did its regular and ordinary work, switching a large number of cars at the towns of Womble, Poplar Grove and Barton, by reason of which he was roughly and cruelly thrown from side to side upon his cot and caused to suffer untold agony and his wounds to receive fresh injuries.   That the company physician failed to do anything for his relief, and upon his arrival at Helena advised that he be taken to the hospital at St. Louis, which was done by defendant's direction, on the morning of September 23.   On arriving at St. Louis at 8:30 P. M., by reason of the failure of the defendant's hospital department to provide an ambulance as it had agreed to do, he was compelled to remain in the station for several hours, and did not reach the hospital until 11 o'clock at night.   That he then received no attention, except a perfunctory examination by an interne, until 11 o'clock the next day, at which time decomposition had set in, and that he died the following morning as a result of said injuries at 7:30 o'clock.

Plaintiff charges that the proximate, the immediate and the only cause of the death of said Campbell was the gross negligence, indifference and inhumanity of the defendant company. Plaintiff charges the truth to be that if the defendant had used even ordinary care and caution in the treatment of said Campbell after the nature and extent of said injuries were fully known to defendant, his life could and would have been saved and his usefulness unimpaired.   That by reason of said failure by defendant to provide surgical and medical attention at the proper time, and by reason of the delay in getting said Campbell where he could be and would have been properly treated, which said delay was caused by the gross negligence and carelessness and indifference of the defendant, said Campbell was caused to suffer and did suffer the most excruciating misery and physical pain, by reason of which he was finally caused to lose his life."   That he left surviving his widow, Maggie Campbell, and five children of the ages of 12, 10, 7, 5 and 3 years, respectively.   At the time of receiving said injuries he was 39 years old, in perfect health and earning $100 a month.   That deceased contributed to the main-

tenance and support of his wife and children as aforesaid the entire amount of his salary; that he was sober, industrious, of good moral character, in direct line of promotion, kind to his children and solicitous of their well being. Prayed judgment for $15,000 for the widow and children and for the mental and physical pain and suffering of deceased, for the benefit of his estate, damages in the sum of $10,000.

Defendant filed a motion to strike out certain parts of the complaint, which was overruled. It then answered, denying that said Campbell was engaged in the performance of his duties as conductor of the train mentioned when he received the injuries complained of. That there had been taken out and retained by the defendant any sum of money from his salary for the support and maintenance of the hospital department of the defendant, and that in return therefor it was understood by and between the said defendant and Campbell that he should receive proper medical and surgical attention, to be supplied and furnished by the said defendant whenever the emergency or necessity therefor should arise; that it was defendant's duty to give such medical and surgical attention to said Campbell, and denied that there was any neglect of such duty. Denied all the material allegations specifically. Alleged that deceased was allowed to remain at Holly Grove after the accident and injury and put upon the return train and carried to Helena at his own solicitation and suggestion, and made as comfortable as possible on his return trip, and handled with all the care and attention as was suggested and required by him. Denied that any physician or surgeon on its behalf failed to do anything for Campbell's relief; alleged that everything possible was done for his comfort and relief, and that it was at his request that he was transferred to the hospital at St. Louis. Denied that there was any failure or refusal of hospital department to provide an ambulance to take him from the station to the hospital, or that it had agreed or promised to do so. Denied that after reaching the hospital he received no attention, and alleged that he was properly examined and treated, and everything known to medical science and surgery was done and performed for the said Campbell. Denied that he died as a result of any neglect of defendant as to his alleged injuries. Denied that it failed to use ordinary care and

caution in the treatment of Campbell, or that his life could and would have been saved and his usefulness unimpaired by the most skillful treatment known to medical or surgical science. Denied that the nature and extent of his injuries were fully known to the defendant at the time; that there was any failure to provide surgical and medical attention at the proper time, or that by reason of any delay to get Campbell to a place where he could and would have been treated he was caused to suffer, or that by reason of any such failure said Campbell was caused to lose his life; that plaintiff was entitled to recover any damage for mental or physical suffering.

Answering the second paragraph of the complaint, denied that deceased was conscious of mental or physical pain and suffering, or that it was caused by or was the direct or proximate result of any cruel or inhuman treatment alleged to have been received by him while on the return trip to Helena, or that any part thereof was caused by any negligence or careless failure of the defendant to provide surgical and medical attention at the proper time, or that there was any failure on the part of defendant to provide proper medical and surgical attention to said Campbell, and alleged that he did receive proper medical and surgical attention and treatment, and whatever was done in the way of caring for him after the injury and in the way of medical and surgical treatment or in transportation to secure the same, or in the waiting for such medical or surgical treatment, was pursuant to the request of the said Campbell himself. Denied that his estate was damaged in any sum whatever by any wrongful or negligent conduct on the part of the defendant. Alleged further that if deceased experienced or endured mental or physical pain or suffering, same was caused and contributed to by his neglect and his own conduct, and pursuant to his own request; that any injuries or damages alleged were within the assumed risks and hazards of said deceased as to his employment, for which the defendant was not liable."

An amendment to the complaint was filed, alleging the sale of the Arkansas Midland Railroad to the St. Louis, Iron Mountain & Southern Railway Company after the filing of the complaint and the consolidation and merger of the said roads. Prayer that said St. Louis, Iron Mountain & Southern Railway Company

be made a party defendant, and for judgment against it as against the Midland.

The St. Louis, Iron Mountain & Southern Railway Company appeared and adopted as its answer to the original and amended complaint the answer filed by the Arkansas Midland Railroad Company; "and each and both of said defendants denied any liability whatever, and prayed judgment on behalf of defendants herein, and for all other and proper relief."

The testimony tended to show that Jack Campbell was conductor on the accommodation train carrying freight and passengers, running from Helena to Clarendon and return, at a salary of $100 a month; that he fell or jumped from the top of a box car to the ground in the yards at Holly Grove about 11 o'clock on the morning of the 22d of September, 1908. That the brakeman and engineer went to his assistance and set him up in the box car, carried him down to the station and sent for the doctor. Dr. Sylar was the company physician at Holly Grove, and reached the patient within 20 or 30 minutes after he was telephoned for. The witnesses first reaching him saw that his ankle was swollen. The skin was not broken, but badly bruised, turning black. He had removed his shoes before they reached him. The car was stopped near the station by Campbell's direction, and the physician examined him while in the car and removed him across the street to Dr. Johnson's house. The engineer, then the superior officer of the train, telephoned the superintendent, reporting the accident and asking for instructions as to the further proceeding of his train. He was directed to proceed to Clarendon and return, and was met on his return trip by the superintendent at Pine City. Campbell suggested that they go on to Clarendon and pick him up on the return trip. Upon reaching Holly Grove on returning, he was brought over on a cot and put in the baggage car, the attendants not being able to get the cot in the coach. The train then proceeded to Helena, doing the usual switching at the different stations, the employees handling it as carefully as possible and with as little jolting and jarring from switching, connecting and disconnecting the train, as was possible. It reached Helena between 8:00 and 8:30. Campbell was carried to his residence, where he was treated by Dr. Cox, the company physician. The next morning he was placed upon one of defend-

ant's passenger trains and taken to the hospital at St. Louis, Mo. After reaching the station there, there was some delay of probably an hour before he was carried to the hospital. Upon arriving at the hospital a physician examined him, unwrapped his feet and took off his splints, and re-wrapped them and put them in a wire basket. He was then put to bed, and about 9 o'clock the next morning the superintendent and chief physician examined him, and about 11 o'clock he was examined with the X-Ray. His father, who had accompanied him to St. Louis, testified that at this time his feet were black. He was then carried back to his ward and warm water in bottles was put around his legs. About 4 o'clock they took him to the operating room, punctured his feet and put in some rubber drainage tubes to let out the bruised and black blood. He was then taken to his ward and suffered considerably, and finally went into convulsions and died at 7:30, the morning of Friday, the 25th, of delirium tremens, the physicians of the hospital testified after an autopsy was made by the medical assistant of the coroner as required by law. The post mortem examination showed "Cause of death: oedema of brain and shock from injury."

Dr. Sylar, the company physician at Holly Grove, stated: "I made an examination of his injury, and there was a fracture and dislocation of the right ankle and dislocation of the left ankle. It was not possible for me to tell the extent of the fracture. The fibula bone was fractured about one and one-half or two inches above the articulation. I could discover no fracture of any other bone of the ankle. There was no abrasion of skin. Patient did not show any symptoms of shock whatever. Heart action and respiration were normal. I made the examination between 11 and 12 o'clock, and was with him most of the time until about 2 o'clock. At that time he was at the residence of Dr. J. M. Johnson on his front gallery. We took him out of the box car about 15 minutes after I got to the depot. I didn't think his injuries fatal. We removed him to Dr. Johnson's front porch and splinted his legs, gave him water and a hypodermic to relieve the pain, and arranged him on a cot comfortably. He did not care for dinner. I gave him such treatment as is customary with physicians of this community as to injuries of similar character."

Campbell told the engineer on the train to take it on to Clarendon, and that he would stay there until the train came back. Dr. Cox, the company physician at Helena, treated him about 8 or 9 o'clock that night. He took a couple of men with him and met the train. Campbell was on a cot, and they unloaded him out of the car and carried him over to the house. There Dr. Cox unwrapped his bandages, loosened them and rebound them, and left some tablets to give him. He came the next morning, and went to the depot with Campbell on his trip to St. Louis.

It was also shown that 50 cents per month hospital fees were deducted from the wages of deceased by appellant; that such deductions were made from the wages of all employees for the support and maintenance of its hospital department for furnishing medical attention to its said employees when the occasion arose therefor. The deceased after his injury was attended and treated by the company's physicians at Holly Grove, the place of the injury, and at Helena, his home, upon his arrival there, and its physicians in its said hospital at St. Louis to which he was sent, all of whom were paid from said sums so derived and collected from the wages of its employees. There was some testimony tending to show negligence upon the part of the physicians in the treatment of his injuries in permitting him to be carried upon the local train to his home after the injury and on to St. Louis, instead of requiring absolute rest for him, and also by the physicians at the hospital there.

The expert witnesses for appellee, in answer to the hypothetical questions propounded to them, stated that deceased should have recovered from the injury, and probably would have done so, with proper treatment; that the indications were he died because of the delay in administering the right treatment; that he died of hyperaemia of the brain and spinal cord, produced by a venous eclusion, which is an obstruction of the venous flow back from the injured part, a restricted condition caused by a tight bandage or something of that kind, the obstruction of the blood causing a loss of its vitality and decomposition to set in, which produced hyperaemia.

The court gave among others, over appellant's objection, the following instructions, Nos. 1, 2 and 3:

"1. You are instructed that if you find from a fair pre-

ponderance of the testimony that the deceased, Jack Campbell, during the time he was in the employ of the defendant company, contributed monthly out of his salary for what is known as hospital dues, and if you further find that it was agreed and understood by and between the deceased and defendant that the payment of such dues entitled him to surgical and medical care and attention in event of his being injured in the course of his employment, *then it was the duty of the defendant to use reasonable care to provide Jack Campbell, the deceased, with such medical and surgical attention and within such times as is usually and ordinarily provided by physicians in the several communities in which he was treated for such injuries.*

"2. You are instructed that if you find from a fair preponderance of the testimony in this case that the proximate cause of the death of the deceased, Jack Campbell, was the *failure on the part of the defendant to use reasonable care to provide such medical and surgical care and attention, and at such times as are usually and ordinarily given by physicians in the localities in which he was treated to injuries of the kind described by witnesses in this case,* then your verdict will be for the plaintiff.

"3. You are instructed that, if you find from a fair preponderance of the testimony in this case that the deceased, Jack Campbell, would have recovered if he had received *such medical and surgical care and attention, and at such times as are usually and ordinarily given to injuries of the kind described in evidence in this case by physicians in the localities in which he was treated,* then your verdict will be for the plaintiff.

And for it, out of 21 instructions asked, all but five, among the number given being 16, which reads:

"16. Even though the hospital at St. Louis and the local surgeons at different points upon the railway system of defendant are maintained by small sums of money deducted monthly from the wages of the employees of defendant, yet the only duty which the defendant owed its employees in regard to medical and surgical attention was to use reasonable care in the selection of physicians, surgeons or attendants."

The jury returned a verdict for $15,000 upon the first paragraph of the complaint for the widow and next of kin, and $5,000

upon the second, for the benefit of the estate, upon which judgment was rendered, and from which this appeal is brought.

*W. E. Hemingway, E. B. Kinsworthy, S. D. Campbell* and *James H. Stevenson,* for appellant.

1. Appellant does not contend that a hospital maintained partly by contributions from employees and partly by the company, and not for profit of the company, is a charitable institution, as is held by some courts, but it is contended that when the hospital, though maintained out of contributions or deductions from the wages of employees, is not a source of profit to the company, and an employee out of whose wages contributions have been made toward the maintenance of the hospital is injured, and is sent to the hospital for treatment, the company is liable only to the extent of being required to exercise ordinary and reasonable care to select competent physicians to care for and treat such cases. 100 Mo. App. 424, 74 S. W. 456; 57 S. W. 695; 94 Tex. 76; 58 S. W. 724; 32 Tex. Civ. App. 487; 19 *Id.* 166; 13 So. 638; 30 S. W. 1030; 44 S. W. 589; 153 Ind. 119; 103 S. W. 272; 11 L. R. A. 711, 712; 154 Mass. 272; 107 N. Y. 228; 89 Ill. App. 199; 47 S. W. 342, 104 Ky. 456; 102 Va. 23.

2. The proper test of the treatment given by a physician in a case is not what is ordinarily and usually given by *physicians in the locality,* but what is ordinarily and usually given by an *ordinarily capable physician* in the locality. 119 S. W. 1082-3; 35 Pa. Sup. Ct. 320-322; 37 L. R. A. 830, 839; 86 Ill. 387; 133 Ill. App. 301; 100 S. W. (Ky.) 312; 102 Pac. (Okla.) 138.

3. The proof is that the local physicians are generally confined in their duties to the giving of *emergency treatment,* and that they are authorized to operate or give final treatment only when a case is so serious as to admit of no delay. There is no contention that it was negligence on the part of either of the physicians who first treated deceased in sending him on to the hospital for more complete treatment than they were prepared to give him. The issue, therefore, which should have been submitted to the jury was whether or not the "temporary" or "emergency" treatment which they gave was, under all the circumstances, negligent.

4. It was error to assume, as was done in instruction 2, that there was a "failure on the part of the defendant to use

reasonable care to provide such medical and surgical attention, and at such times as are usually and ordinarily given by physicians in the localities in which he was treated for injuries of the kind," set out in the complaint and proof, and then to authorize the jury by said instruction to find for the plaintiff, if they found "that the proximate cause of the death of deceased" was such failure.

Instruction 3 is erroneous in that it assumes that deceased *did not receive* "such medical and surgical attention and at such times as are usually and ordinarily given by physicians in the locality in which he was treated."

4. It is error to admit hypothetical questions and answers thereto, unless such questions fairly reflect the evidence, and where they omit a material part of the facts which should be considered in their determination. Not only must such questions embrace undisputed facts that are essential to the case, but it is the duty of the court to see that such a question is so framed as to prevent the opinion given in response thereto from misleading the jury by concealing the real significance of the evidence or unduly emphasizing a part thereof. 87 Ark. 243, 293, 294 and authorities cited.

*Fink & Dinning,* for appellee.

1. Under the proof in this case, the hospital association is but the agent of the appellant. It cannot be held to be a charitable association, and the rule which exempts such institutions from liability does not apply. Neither is such institution exempted from liability by the mere employment of competent servants, but it must go further and *competently treat* the patients received. 14 Am. & Eng. Ann. Cas. (Mo.) 742; 34 Am. Rep. 673; 121 S. W. (Tex.) 1133; 20 Tex. Civ. App. 642; 124 S. W. (Tex.) 202; 30 Wash. 349; 70 Pac. 972; 94 Am. St. Rep. 880; 86 Ark. 465, 469; 87 Ark. 628, 632.

2. Counsel are hypercritical in their objections to instructions 1, 2 and 3. As to the physicians, the language employed therein could mean nothing more nor less than the average or ordinary physician, in so far as it applies to his care and skill. To say that these instructions required the same high degree of care as would be required of the "best" physician in the commu-

nity is unreasonable. The care and skill required in the performance of a surgical operation is that reasonable degree of care and skill that physicians and surgeons ordinarily exercise in the treatment of their patients. 2 L. R. A. 587. A physician must use the ordinary skill and care of the profession generally. 39 Vt. 447; 94 Am. Dec. 338; 31 Bard. 534; 80 N. Y. 631; 47 Neb. 727; 21 Minn. 464; 86 Me. 414; 34 Ia. 287; 11 Am. Rep. 14; 56 Ind. 467.

If appellant desired the word "physicians" to be limited to those of ordinary care and skill, it should have called the trial court's attention thereto by specific objection, pressed to a ruling. 65 Ark. 254; 71 Ark. 314; 81 Ark. 187; 82 Ark. 387; 89 Ark. 522; 140 U. S. 76. Under the instructions from the hospital association distributed to employees to the effect that "whenever passengers or employees are injured *everything* must be done to care for them properly," deceased was entitled to more than temporary treatment, and to be treated by surgeons who were permitted to exercise their best judgment in treating him.

3. The objection taken at the trial of this case to appellee's hypothetical question reveals the fact that appellant excepts because the question assumes matter not in evidence, but no objection is made because it does not embrace material matters that are in evidence. Since there is no complaint of anything except alleged omissions, appellant has no right to urge such objection in this court for the first time.

KIRBY, J., (after stating the facts). It is insisted by appellant that it was not maintaining its hospital department and employing physicians with the expectation of deriving any gain or profit therefrom, and that it was only liable, in furnishing medical attention to deceased, to use reasonable and ordinary care in the selection of competent and skilled physicians to administer it, and not for the negligence or malpractice of such physicians so selected; and by appellee that since said railroad company employed its physicians and maintained and supported its hospital by deductions made from the wages of its employees, without regard to their consent thereto, in fact assuming for pay taken from its said employees to furnish them proper medical and surgical attention, that it was bound to answer for the negligence of its said physicians in their treatment of such employees. This

question is for the first time before our court, and it has been decided differently by the courts of other jurisdictions. A physician cannot be regarded as an agent or servant in the usual sense of the term, since he is not and necessarily cannot be directed in the diagnosing of diseases and injuries and prescribing treatment therefor, his office being to exercise his best skill and judgment in such matters, without control from those by whom he is called or his fees are paid. It is generally held that hospitals conducted for charity are not responsible for the negligence or malpractice of their physicians, and that persons and hospitals who treat patients for hire with the expectation and hope of securing therefrom gain and profit are liable for such negligence and malpractice on their part.

It is alleged in this case that deductions were made monthly from the salary of the intestate, as required by the rules and regulations of the company, "for the support and maintenance of the hospital department of said company, and, in return for such monthly payments or assessments, it was understood by and between said company and said Campbell that he should receive proper medical and surgical attention to be supplied and furnished by said defendant whenever the emergency and necessity for said medical and surgical attention arose."

There was no allegation that such hospital department was conducted for gain or profit to the company, and no proof showing that any such gain or profit resulted to it because of such deductions from the wages of its employees, over and above the maintenance and support of said hospital department, and the company denied any understanding or agreement on its part to furnish proper medical attention for the deductions made.

It could not be said to be conducted as a charity, for only those employees who had contributed the fees deducted from their wages for its maintenance were entitled to enter there for treatment, and all the physicians and employees required to maintain and operate it were paid from such fund. Nor can it be said to have been administered by the railroad company out of pure philanthropy, since it may have had some benefit therefrom in decrease of amount of damages for injuries caused in the operation of the road, and the better and more efficient service to the company by its employees because of its maintenance. It is also

true that none of the employees are required to accept the treatment provided at said hospital, and cannot do so unless before their service with the railroad company is ended, thus in effect creating a fund for the benefit of themselves it may be, and certainly for others, for how few of all those contributing thereto receive any personal benefit therefrom and how small a part of the expense of caring for an injured employee was actually paid by him, to provide hospital accommodations and medical skill and attention, to relieve pain and suffering and restore health, without any hope of any other profit or gain upon their part, and without any purpose upon the part of the company in the deduction of the fees from their wages and collecting such fund other than to administer it for the support and maintenance of the said hospital department, as alleged, and without any gain or profit therefrom to it, so far as the testimony in this case shows. It was not contemplated by such employees in their contribution to this fund that it should be used in the payment of damages for the negligence or malpractice of physicians employed in the operation of such department, and certainly the railroad company that assumed gratuitously to collect and preserve such fund and provide hospital accommodations and competent physicians and surgeons to operate it, without any profit or gain or hope thereof therefrom, should not be required to pay damages for such negligence or malpractice, it being no part of its business under its charter to maintain a hospital. At most, it can only be considered a trustee for the proper administration and expenditure of such fund, and should be held only to ordinary care in the selection of competent and skillful physicians to administer relief and provide attention to sick and injured employees. *Union Pac. R. Co.* v. *Artist,* 60 Fed. 365, 9 C. C. A. 142, 3 L. R. A. 851; *Big Stone Gap Co.* v. *Ketron,* 102 Va. 23, 45 S. E. 740; *Texas Central Rd. Co.* v. *Zumwalt* (Texas) 132 S. W. 113; *Louisville & Nashville Rd. Co.* v. *Ford,* 104 Ky. 456, 47 S. W. 342; *Cummings* v. *C. & N. W. Ry. Co.,* 189 Ill. 608; *Fire Ins. Patrol* v. *Boyd,* 120 Pa. 643, 15 Atl. 533, 1 L. R. A. (N. S.) 417.

It follows that the instruction No. 16, given on the part of appellant, was a correct statement of the law defining the care required of it in the selection of competent and skilled physi-

cians, and that said instructions 1, 2 and 3, being in conflict therewith and requiring a different and higher degree of care of the railroad company and holding it responsible for negligence and malpractice on the part of physicians employed for its hospital department and treatment of employees, were erroneous, and should not have been given.

II.   If the railroad company did in fact realize a profit from the total deductions from the wages of its employees for the hospital fund, after paying for the support and maintenance thereof, and the employment of physicians, or if it agreed and contracted with such employees, in consideration of the fees paid by them, to furnish proper medical attention, the rule might be different. No such contract of employment to furnish medical attention for such consideration was shown to exist, nor was it shown that the funds so collected amounted to more than the expenses of carrying on said hospital department, nor that any of such fund was used by the railroad company.   The testimony of the chief surgeon as to the receipt and disbursement of the funds, same being paid out by his direction, was that it was for the maintenance of hospital and emergency hospitals for treating sick and injured employees, and not for gain or profit.   "The funds so derived are used solely for that purpose" was competent and should not have been withdrawn.

There was no error in permitting the hypothetical questions to be asked.   In *Missouri & N. Ark. Rd. Co.* v. *Daniels, ante,* p. 352, the court said:   "In propounding a hypothetical question to an expert witness, the data upon which it is based need not cover all of the facts which have been proved in the case.   The party offering the testimony may select such facts as he conceives to have been proved, and predicate his hypothetical question thereon."

And in *Taylor* v. *McClintock,* 87 Ark. 243:

"The party desiring opinion evidence from experts may elicit such opinion upon the whole evidence or any part thereof, and it is not necessary that the facts stated as established by the evidence should be uncontroverted.   Either party may state the facts which he claims the evidence shows, and the question will not be defective if there be any evidence tending to prove such facts."

For the errors indicated, the judgment is reversed, and the cause remanded.